**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

KATHALEEN ST. JUDE MCCORMICK
CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

September 30, 2022

Richard E. Berl, Jr., Esquire
Hudson, Jones, Jaywork & Fisher, LLC
34382 Carpenter's Way
Suite 3
Lewes, DE 19958

Gary Shockley
SBI Number 00139419
Sussex Correctional Institution
P.O. Box 500
Georgetown, DE 19947

Re:     *Melvin Green v. Gary Shockley*,
        C.A. No. 2018-0782-PWG

Dear Mr. Berl and Mr. Shockley:

This above-referenced action concerns the distribution of proceeds from the sale of partitioned property and rental income collected from it. On January 31, 2022, Master Griffin issued a final report (the "Final Report") directing the distribution of sales proceeds from the properties.[1] The petitioner took exceptions to the Final Report. This letter resolves the petitioner's exceptions.

## I.     Factual And Procedural Background

Although the court has the discretion to conduct independent fact-finding through a new hearing, that is only necessary "where exceptions raise a *bona fide* issue as to dispositive credibility determinations."[2] Where a new hearing is not required, "the court

---

[1] C.A. No. 2018-0782-PWG, Docket ("Dkt.") 80 ("Final Rep."). Unless otherwise specified, docket entries throughout this letter refer to those in this case. I also refer to relevant transcripts in this case as follows: The transcript of the September 1, 2021 hearing (Dkt. 70) is "Trial Tr."; Green's trial exhibits (*see* Dkt. 67) are "Pet'r Tr. Exs."; and the June 29, 2022 oral argument in this matter (Dkt. 96) is "Arg. Tr."

[2] *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999).

'may read the portion of the record relevant to the exception raised and draw its own factual conclusions' in evaluating [a] master's exceptions."[3]

I have reviewed the underlying record and determined that a new hearing is not required. The petitioner's exceptions, taken together, challenge the method by which the Master drew her conclusions and her alleged lack of evidentiary support for those conclusions. The credibility of the evidence presented to either the Master or me, however, is not at issue. Although Green has submitted additional evidence in the form of bank statements,[4] Green's evidence fails to change the outcome of this case as a matter of law, as I explain below under Legal Analysis. A hearing would not provide me with any additional information I need to make my determination.

I therefore address the relevant portions of the record below, specifically, the trial transcript, the petitioner's trial exhibits, and relevant Estate administration records "to aid in my understanding of the matter."[5] Where this decision cites to the Master's factual findings in the Final Report, it is because I have reviewed the relevant portion of the record and agree with her findings.

---

[3] *Houseman v. Sagerman*, 2022 WL 1052193, at *1 (Del. Ch. Apr. 8, 2022) (quoting *DiGiacobbe*, 743 A.2d at 184).

[4] *See* Dkt. 86 ("Pet'r Opening Br., Ex. B").

[5] *Houseman*, 2022 WL 1052193, at *1.

A.      The Parties And The Properties

Petitioner Melvin Green ("Petitioner") and Respondent Gary Shockley ("Respondent") each held a one-half interest in two pieces of real property, which they inherited as tenants in common on February 24, 2016, upon the death of Shockley's mother, Margaret R. Taylor ("Decedent").[6]  One property, 32790 Bi State Boulevard, Laurel, Delaware, was Decedent's home (the "House Property"), and the other property, 32715 Bi State Boulevard, Laurel, Delaware, was a rental property containing six rental units (the "Apartments Property," and with the House Property, the "Properties").[7]

The rental units on the Apartments Property comprise five apartments and a manufactured house.[8]  Green lived in the House Property with Decedent, and Green continued to reside there after her death.[9]  Nationstar Mortgage, LLC ("Nationstar") held a mortgage on the House Property.[10]  Green handled rent collection for the Apartments Property, which he testified was not always consistent.[11]  He was also the executor of

---

[6] *See* Dkt. 1 ("Pet.") ¶¶ 1–4; *see In re Margaret R. Taylor*, Register of Wills Folio No. 11034 ("ROW Folio"), Dkt. 2 at 1–2.

[7] ROW Folio, Dkt. 2 at 1.

[8] *See* Pet'r Tr. Exs. B, E.

[9] Trial Tr. at 119:8–20.

[10] Pet. ¶ 7.

[11] *See* Trial Tr. 14:13–20 (describing Section 8 housing subsidies); *id.* 18:18–24 (describing one tenant who never paid rent); *id.* 21:16–22 (describing another tenant who paid rent irregularly).

Decedent's estate (the "Estate").[12]  Shockley's brother and agent, Richard Shockley,[13]

collected some rental income from the manufactured house.[14]

### B.     The Partition

Green filed this partition action on October 29, 2018.[15]  An initial hearing took place

on January 7, 2019, and the matter was stayed for 30 days for the parties to consider

whether to pursue a partition in kind or a private sale.[16]  On February 28, 2019, Shockley

filed a response to the petition for partition.[17]  The Master advised the parties on April 1,

2018, that partition in kind with owelty was not appropriate in this case.[18]  On April 24,

2019, the Master ordered a partition sale and appointed a trustee (the "Trustee") to

complete it.[19]  On April 29, 2019, Shockley filed a motion for a writ of injunction seeking

---

[12] *See* ROW Folio, Dkt. 21.

[13] This letter distinguishes the Shockley brothers by referring to Richard Shockley by his first name.  The court means no disrespect.

[14] *See* Trial Tr. at 78:10–11, 104:6–9, 112:6–17, 114:10–12.  At trial, Green asserted that Richard also collected rent from one of the apartments.  *See* Pet'r Tr., Ex. E.  Richard denied this claim.  Trial Tr. at 101:19–21.  The Master weighed this conflicting testimony and determined that Richard collected $5,200.00 in rent from the trailer.  Final Rep. at 10 n.46.  Shockley has been incarcerated since before Decedent's death.  *See* Final Rep. at 8 n.39.  As such, Richard acted on Shockley's behalf on various occasions.  *See* Trial Tr. at 71:2–11.

[15] Pet.

[16] *See* Dkt. 8.

[17] Dkt. 17.

[18] Dkt. 26.

[19] Dkt. 27.

to have rental monies held in escrow until the partition sale process was completed, which the Master denied on June 26, 2019.[20]

The Properties were subject to a public auction on October 11, 2019.[21] The Apartments Property secured a purchase price of $132,000.00 in a transaction that closed on November 6, 2019.[22] The Trustee made his return of sale on November 8, 2019, and the Master approved it on November 26, 2019.[23] The House Property secured a purchase price of $10,000.00, but the buyer did not complete the sale.[24] The Trustee advised that marketing the House Property would be futile because Nationstar was foreclosing on the House Property's mortgage.[25] The Trustee has held $121,781.58 in escrow from the sales of the Properties.[26]

### C. The Distribution Dispute

Shockley submitted a proposed decree of distribution first on October 24, 2019, and again on December 20, 2019.[27] Shockley requested a setoff against Green's amount for

---

[20] Dkt. 29; Dkt. 33.

[21] Dkt. 36 ¶¶ 9, 16.

[22] *Id.* ¶¶ 16, 18.

[23] *See id.*; Dkt. 37.

[24] Dkt. 44 at 2. The House Property was sold in a sheriff's sale on August 17, 2021. *See Nationstar Mortg. LLC d/b/a Mr. Cooper v. Est. of Margaret R. Taylor*, C.A. No. S18L-12-033 CAK (Del. Super.), Dkt. 21.

[25] *Id.*

[26] Dkt. 69.

[27] Dkt. 35; Dkt. 41.

Green's use of the House Property.[28]  Green filed his proposed decree of distribution on February 24, 2020.[29]  He sought 60% of the sale proceeds for himself and 40% for Shockley, justifying the unequal split based on his services to the Properties.[30]

The Master conducted an evidentiary hearing on the issue of distribution on September 1, 2021,[31] and issued the Draft Report on December 8, 2021.[32]  Green filed exceptions to the Draft Report on December 13, 2021, followed by an opening brief in support of these exceptions on December 20, 2021.[33]  Shockley filed an answering brief on January 10, 2022.[34]  Green filed a reply brief on January 11, 2022.[35]

### D.     The Master's Final Report

The Master's Final Report, filed on January 31, 2022, divided the proceeds equally, subject to certain "specific contributions and offsets."[36]

---

[28] Dkt. 41 at 6.

[29] Dkt. 45.

[30] *Id.* at 5.

[31] *See* Dkt. 68.

[32] Dkt. 71 ("Draft Rep.").

[33] Dkt. 72; Dkt. 75.

[34] Dkt. 77; Dkt. 78.

[35] Dkt. 79.

[36] Final Rep. at 7.

From November 2017 through November 2019,[37] Green collected $47,215.50 in rent from the Apartments Property[38] and Richard, as Shockley's agent, collected $5,200.00 in rent from the trailer at the Apartments Property.[39]

In the September 1, 2021 hearing, Shockley argued that the rental income accrued to both co-tenants beginning at Decedent's death in February 2016.[40] Green countered that the Estate managed the Apartments Property between her death and the Estate's closing on October 9, 2017 (the "Estate Administration Period"), so, in the absence of Shockley's objections to the Estate, the Master should not consider rental income from that period in her partition analysis.[41]

The Master sided with Shockley on this issue, accounting for rental income for the Apartments Property from Decedent's death in February 2016 onward.[42] The Master determined, as a matter of Delaware law, that Green and Shockley became tenants in common immediately upon Decedent's death; thus, the rental income accrued not to the Estate but to Green and Shockley.[43] The Master determined that "Shockley's failure to

---

[37] Dkt. 41 at 6.

[38] *See* Pet'r Tr., Ex. B. Although Shockley claimed that Green underrepresented rents collected, the Master determined that Shockley did not provide proof that Green collected any rental income beyond what Green reported at trial. Final Rep. at 9 n.42.

[39] Final Rep. at 10 n.46.

[40] *See* Trial Tr. 63:9–64:3.

[41] *See id.* 126:3–19.

[42] Final Rep. at 10–11.

[43] *Id.*

object to the Estate's First and Final Account filed with the Register of Wills [did] not foreclose looking at rental income that accrued between March of 2016 and October of 2017."[44]

Green testified that the attorney for the Estate, Harold Purnell, handled the rental income and payments of expenses for the Apartments Property during the Estate Administration Period.[45] Under Delaware law, if an estate collects rents and profits of the decedent's real estate, the executor or administrator must account for those rents and profits as assets of the estate.[46] The Estate's First and Final Account did not list rents and profits from the Properties.[47] Therefore, the Master did not treat those rents and properties as Estate assets, and she determined that the Estate's First and Final Account did not put Shockley on notice to object to the Estate's accounting of those rents and profits.[48]

The parties presented no evidence during the September 1, 2021 hearing concerning the amount of rent collected during the Estate Administration Period. Shockley asked the Master to presume that the Apartments Property was fully rented and to assume that the parties had collected 100% of the rent.[49] The Master rejected this approach as inequitable

---

[44] *Id*. at 12 (discussing ROW Folio, Dkt. 20 ("Est.'s First and Final Acct.")).

[45] *See* Trial Tr. at 13:7–10, 38:11–39:11.

[46] *See* 12 *Del. C.* § 1902.

[47] *See* Est.'s First and Final Acct.

[48] Final Rep. at 12.

[49] *Id.* at 14.

because testimony showed periods of partial vacancy and incomplete rent collection.[50]

Instead, she estimated the amount of rent collected during the Estate Administration Period

using a monthly average of rent collected between November 2017 and November 2019.[51]

Combining the amount of rent Green collected ($47,215.50) and the amount that Shockley

collected through his agent Richard ($5,200.00), the Master determined that the

Apartments Property generated $52,415.00 during that period.[52]  This corresponds to an

average monthly revenue of $2,096.62 during the 25 months at issue.[53]  The Master also

estimated that the Apartments Property generated $41,932.40 in revenue from March 2016

to October 2017, arriving at a total revenue estimate of $94,347.90 for the period of March

2016 to November 2019.[54]

Based on the above, the Master concluded that a division of $47,173.95 ($94,347.90

divided by two) was required to each of Green and Shockley less contributions or expenses

paid.[55]  She determined, however, that Green had realized approximately $87,477.40 of

this revenue while Shockley had realized only $6,900.50.[56]  Therefore, to ensure both

---

[50] *Id.*; *see also, e.g.*, Trial Tr. at 18:18–24 (describing one tenant who never paid rent); *id.* at 21:16–22 (describing another tenant who paid rent irregularly); *see also id.* 39:12–22 (describing that the rents collected during the period of the Estate were "[b]asically, about the same thing" as the rents collected after the Estate was closed).

[51] Final Rep. at 15.

[52] *Id.*

[53] *Id.*

[54] *Id.* at 14–15.

[55] *Id.*

[56] *Id.* at 15.

parties ultimately received $47,173.95, the Master determined that Shockley must receive an additional $40,273.45 from the partition proceeds while reducing Green's share by the same amount.[57] As part of her calculus of a fair split, the Master concluded that Green had made $7,153.73 in mortgage payments on the House Property, and that Shockley had paid $200 in property taxes.[58] The Master also estimated that Green had incurred $12,876.73 in mortgage and tax expenses for the period of the Estate while Shockley had incurred $360.00 of the same.[59] Green provided proof of $1,906.23 in utility costs and $4,368.09 for repairs to the Apartments Property, and she calculated an estimate based on these figures to account for those costs during the administration of the Estate.[60] In sum, the Master's estimate of Green's repair and utility expenses came to $5,019.40 from March 2016 to October 2017.[61]

Therefore, based on an even split subject to the appropriate expense offsets, the Master decided to distribute the $121,781.58 in sales proceeds as follows: $32,522.56 to Green, $87,450.52 to Shockley, and $1,808.50 to the Register in Chancery.[62] The payment to the Register in Chancery reflected the fact that the Master had previously granted Shockley's *in forma pauperis* application with the condition that, if the real property was

---

[57] *Id.*

[58] *Id.* at 16–17.

[59] *Id.* at 17–18.

[60] *Id.* at 19–21.

[61] *Id.*

[62] *Id.* at 23.

sold, Shockley would pay fees and court costs, which the Register in Chancery calculated to be $1,808.50.[63]

### E. Green Files Exceptions.

Green filed exceptions to the Final Report on February 2, 2022.[64] He filed an opening brief in support of his exceptions on February 18, 2022.[65] Shockley attempted to file his answering brief on March 2, 2022, but it was not docketed until May 11, 2022.[66] Green filed his reply brief on May 11, 2022.[67]

In his exceptions to the Final Report, Green argued two main points: First, that the Master erred in including the Estate Administration Period in her partition analysis; and second, that her decision to do so unfairly prejudiced him.[68]

Additionally, on June 13, 2022, Shockley moved to bar Green's unfair prejudice argument on procedural grounds under Court of Chancery Rule 144(c) and to bar the court from considering his reply brief under Rule 144(d)(1) (the "Motion to Bar").[69]

---

[63] *Id*. at 22–23.

[64] Dkt. 81 ("Pet'r Exceptions").

[65] Dkt. 84 ("Pet'r Opening Br.").

[66] Dkt. 89 ("Resp't Answering Br.").

[67] Dkt. 90 ("Pet'r Reply Br.").

[68] Pet'r Opening Br. at 6–13.

[69] Dkt. 92 ("Mot. to Bar").

I heard oral argument on the Petitioner's exceptions and Shockley's motions on June 29, 2022.[70]

## II.     Legal Analysis

My analysis proceeds in two parts. First, I address Shockley's Motion to Bar, which, in turn, raises two threshold objections: That Rule 144(c) prohibits Green from taking exception for undue prejudice, and that Green filed his reply brief untimely under Court of Chancery Rule 144(d)(1). Next, I address the substantive matters that Green raises in his exceptions to the Final Report.

### A.     Shockley's Motion to Bar Petitioner's Arguments Under Rule 144(c)

Rule 144(c) permits two categories of exceptions, providing that "the only exceptions that a party may take to a [Master's] final report are (i) exceptions to the draft report that were timely filed and disallowed and (ii) exceptions to any differences between the draft report and the final report."[71] A petitioner may satisfy either category of Rule 144(c) to avoid being barred under Rule 144(c), but need not satisfy both.

Shockley posits that Green's unfair-prejudice argument exceeds the scope of Rule 144(c) because he did not raise it in connection with the Draft Report and there was no difference between the Draft and Final Reports.[72] Green responds that his exceptions do, indeed, strike at a difference between the Draft and Final Reports.

---

[70] *See* Dkt. 95.

[71] Ct. Ch. R. 144(c).

[72] Mot. to Bar ¶ 1.

There was a difference between the Draft and Final Reports. The Final Report added Footnote 53, which addressed Green's exceptions to the Draft Report.[73] Footnote 53 of the Final Report did not simply reword what the Draft report had already iterated. It is a multi-page discussion of issues highly relevant to why the Master rejected Green's exceptions to the Draft Report, including the Master's finding that Green had not collected any rental income from the Apartments Property on behalf of the Estate.[74] Green's unfair-prejudice argument speaks to the issue raised throughout his exceptions to the Draft Report and addressed in Footnote 53. For this reason, Green's unfair-prejudice exception to the Final Report satisfied 144(c)(ii).

Shockley's Motion to Bar under Rule 144(c) is denied.

## B. Shockley's Motion To Bar Petitioner's Reply Brief Under Rule 144(d)

Under Court of Chancery Rule 144(d)(1), any reply brief must be filed "within fifteen days of the answering brief."[75]

Shockley argues that the Petitioner's reply brief is time-barred because he filed it on May 11, 2022, 54 days after Shockley filed his answering brief on March 2, 2022.[76] Green responds that he filed timely, three hours after Shockley's answering brief was docketed.[77]

---

[73] *See* Arg. Tr. 18:5–19:1 (discussing Final Rep. at 12–13 n.53).

[74] Final Rep. at 12–13 n.53.

[75] *See* Ct. Ch. R. 144(d)(1).

[76] Mot. to Bar ¶ 2.

[77] Arg. Tr. 19:2–19.

As previously noted, Shockley's answering brief did not post to the docket until May 11, 2022.[78]  On May 10, 2022, Green's counsel wrote a letter to the court explaining that he was waiting for Shockley's answering brief to post to the docket before filing his reply brief.[79]  Counsel filed the reply brief within three hours of the answering brief posting to the docket.[80]  It would be inequitable to hold this delay against the Petitioner, who affirmatively noticed the court to this discrepancy on the docket.  Therefore, Petitioner substantially complied with Rule 144(d)(1).

Shockley's Motion to Bar under Rule 144(d) is denied.

### C.  Green's Motion For Exceptions

Under Rule 144, the Master's report is subject to *de novo* review as to both fact and law.[81]  Reviewing the Master's legal determinations *de novo* requires me to "review the evidence anew and consider the competing arguments afresh."[82]  This standard does not

---

[78] *See* Resp't Answering Br.

[79] Dkt. 88.

[80] *See* Resp't Answering Br.; Pet'r Reply Br.

[81] Ct. Ch. R. 144(a) (a Master's final report shall include "factual and legal determinations sufficient to support the Master's decision and to permit *de novo* review by the Court"); *see also Rivest v. Hauppauge Digital, Inc.*, 2022 WL 3973101, at *15–16 (Del. Ch. Sept. 1, 2022) (quoting *DiGiacobbe*, 743 A.2d at 184 ("In reviewing a report of the Master in Chancery, this Court employs a *de novo* standard in reviewing questions of law.") (Quoting *In re Est. of McNatt*, 1999 WL 135240, at *2 (Del. Ch. Feb. 25, 1999))).

[82] *Rivest*, 2022 WL 3973101, at *16 (discussing Ct. Ch. R. 144).

require me to ignore the Master's work; a court may properly "conduct a review *de novo* on the record" generated by a Master.[83]

Green advances two arguments on exception. First, he argues that the Master erred by including rental income generated during the Estate Administration Period in her partition calculus.[84] Second, he argues that this decision resulted in unfair prejudice against him.[85]

### a. The Treatment of Rental Income From The Estate Administration Period

Green argues that the Master erred by including the Estate Administration Period in her accounting of rental income for two reasons.[86]

Green's first argument is that Shockley waived exceptions by failing to object to the Final Account filed with the Register of Wills. He argues that rents collected during the Estate Administration Period were part of the Estate. Under 12 *Del. C.* § 2302(d), parties must file exceptions to estate accounts no later than three months after the Register of Wills provides a notice of the filing of the account.[87] The Final Account for the Estate was filed on June 30, 2017. Green argues that Shockley must have had notice of the concerning rents because he had communicated in June 2016 with Purnell about how he anticipated

---

[83] *DiGiacobbe*, 743 A.2d at 184.

[84] Pet'r Opening Br. at 6–10.

[85] *Id.* at 11–13.

[86] *See* Pet'r Exceptions ¶ 1; Pet'r Opening Br. at 6.

[87] Pet'r Opening Br. at 6 (discussing 12 *Del. C.* § 2302(d)).

shared rental income and expenses.[88]  By failing to challenge the Final Account timely, Green claims that Shockley forfeited any claim to the rental income collected during the Estate Administration Period.  Green argues, therefore, that the Master should have carved that period out of her partition analysis.

Green's second reason for finding error resembles the first, although he has framed it slightly differently.  By including the Estate Administration Period in her analysis, Green says, the Master unlawfully "allowed Shockley to collaterally attack prior decisions of the Register of Wills and of this Court confirming the Account."[89]

Green's arguments both rest on the notion that rental income collected during the Estate Administration Period was part of the Estate.  That is false.  It is true that, under Delaware law, an estate's first and final account must distribute the "real estate of the deceased which shall come into the hands of the executor."[90]  A beneficiary of an estate must file exceptions in writing with the Register of Wills within three months of the filing

---

[88] Pet'r Opening Br. at 7 (citing Dkt. 29, Ex. 3).

[89] Pet'r Opening Br. at 7.

[90] *See* 12 *Del. C.* §§ 1902(a), 2301(a) (describing reporting requirements for executors and administrators of estates as to a deceased person's real estate rents and profits); *see also Harman v. Eastburn*, 76 A.2d 315, 319 (Del. Ch. 1950) (holding that, when an executor is in possession of a decedent's real property, the executor "may collect the rents and use them as assets of the estate for the payments of debt").

of an account.[91]    Title 12, Section 2302(d) of the Delaware Code provides that

"[e]xceptions not filed within such 3-month period shall not be considered by the Court."[92]

Section 2302(d), however, has no bearing on assets that do not become part of an

estate.[93]   Here, Green did not include rental income from the Apartments Property in the

Estate's First and Final Account.[94]  As a result, the rental income never entered the Estate.

Therefore, neither the Estate administrator nor the Register of Wills ever had the authority

to determine distributions of rental income generated by the Apartments Property.  Filing

exceptions to the account, timely or otherwise, would have afforded Shockley no recourse

in claiming his share of the rental income.   Therefore, the appropriate—and only—

mechanism for Shockley to recover his rental income is a partition action, not the Estate

accounting.

Moreover, Shockley's letter to Purnell does not prove that the rental income was

collected on behalf of the Estate or that Shockley had notice to that effect.  In his letter,

Shockley wrote that he intended to assume mortgage payments and taxes and to split with

Green the rental payments accrued from tenants of the Apartments Property.[95]  In this letter,

---

[91] 12 *Del. C.* §2302(d).

[92] *Id.*

[93] *See Est. of Simmons*, 2016 WL 590373, at *5 (Del. Ch. Feb. 11, 2016) (stating that "the three month statutory period to challenge an accounting does not bar the respondents' counterclaim regarding the [assets at issue], because those funds were not estate assets and should not have been reflected on the Accounting").

[94] *See* Est.'s First and Final Acct.

[95] Dkt. 29, Aff. of Pet'r at 3–4.

he also referred to himself as a co-tenant of the Properties.[96] Shockley's letter does not reflect notice or an understanding that the rental income from the Properties was collected as part of the Estate.

Finally, the Master's review of the rental income during the Estate Administration Period did not amount to a collateral attack on the Register of Wills' handling of the Estate. "A collateral attack is an attempt to avoid, defeat, evade, or deny the force and effect of a final order or judgment in an incidental proceeding other than by appeal, writ of error, certiorari, or motion for new trial."[97] Belated challenges to related instruments—such as trusts incorporated by reference into a will—are impermissible collateral attacks where the related instrument is an "inextricable part of" the will.[98]

Shockley's actions in this case do not amount to a collateral attack. As discussed above, the rental income from the Apartments Property never entered the Estate. The First and Final Account provided no avenue for resolving the equitable distribution of proceeds between the tenants in common. Therefore, the Master's distribution of the rental income generated at these properties does not "avoid, defeat, evade, or deny the force and effect" of the Estate accounting.[99] The Master was correct to divide these assets.

Green's first argument for exceptions is therefore denied.

---

[96] *Id.*

[97] *In re Vale*, 2015 WL 721038, at *4 (Del. Ch. Feb. 19, 2015) (internal quotation marks omitted).

[98] *DiSabatino v. Diferdinando*, 2001 WL 812014, at *2 (Del. Ch. July 9, 2001).

[99] *In re Vale*, 2015 WL 721038, at *4 (internal quotation marks omitted).

b.      **Unfair Prejudice**

Green's next argument is that the Master failed to "require the preparation and filing of a Pretrial Stipulation and Order."[100]  Without a Pretrial Stipulation and Order or any other form of notice, Green claims that he "had no reason to suspect that his administration of the Taylor Estate period would be the subject of inquiry, and certainly not as part of a separate partition action."[101]  Armed with such notice, Green claims he would have "added to his exhibits and presentation the estate bank account statements from the Bank of Delmarva," which he attached to his Opening Brief as Exhibit B.[102]  The only pretrial submission prior to the September 1, 2021 hearing was the delivery of exhibits and an identification of witnesses.[103]

On exceptions, Green submitted his bank statements, which he claims present a more accurate picture of the rental income received from the Apartments Property.  He argues that the Apartments Property was "barely in the black" each month[104] and that the rental income during the Estate Administration Period was on average lower than the rental income between November 2017 and November 2019.[105]  He contends that the Master's

---

[100] Pet'r Opening Br. at 11.

[101] *Id.*

[102] *Id.*

[103] *See* Dkt. 54.

[104] *Id.* at 12.

[105] *Id.* at 11–12.

estimates are "speculative,"[106] resulting in a windfall to Shockley and an unfair penalty to himself.[107]

Effectively, Green criticizes the Master for failing to rely on the actual bank statements and instead conducting an estimate that he says did not reflect actual revenues.

Although Green frames this as a notice issue, he does not cite any cases to support his argument that the lack of a pretrial stipulation rendered him ignorant of the issues being tried. Moreover, he testified at trial that he did not have complete documentation of the rental records from the Estate Administration Period.[108] Even now he has not produced evidence sufficient to document the full cash flow of the Apartments Property during that time. Therefore, even assuming *arguendo* that Green lacked fair notice ahead of the September 1, 2021 hearing, unfair prejudice could not have resulted because he has since then been unable to produce evidence that he claims would have saved his case.

Green's preferred method of calculating rental income is not a superior accounting method to that adopted by the Master in any event. At the September 1, 2021 hearing, Green testified that his rent collection during the Estate Administration Period was "[b]asically, about the same thing" as what he collected in the following period, on which the Master based her calculation.[109] Further, Green testified that he had not included the

---

[106] *Id.* at 12.

[107] *Id.* at 12–13.

[108] *See* Trial Tr. 37:17–44:1.

[109] *Id.* 37:5–7, 39:20.

rental records from the Estate Administration Period in his trial exhibits because he "didn't have" them.[110]  He testified that he had received IRS 1099 forms for the rental income but could not find them.[111]

Green's prior testimony couples with argument made during the June 29, 2022 hearing, confirm that the later-produced bank statements do not tell the full picture. Shockley made compelling arguments that Green's bank statements did not include all rental payments received, including cash payments for the trailer and two apartments.[112] The bank statements list deposits and payments and include copies of cleared checks, but they do not detail the cash flow for each unit of the Apartments Property.[113]  They do not appear to include any cash deposits into the account or any personal deposits by Green.[114] Listed payments are from "Delaware St Hous [sic]" and "DDA Regular Deposit" for subsidized housing.[115]

The bank statements, coupled with Green's arguments, emphasize the prudence of the averaging approach taken by the Master.  Using the monthly average of documented monthly rents collected between November 2017 and November 2019 is the most equitable means of accounting for the missing rent collection records.

---

[110] *Id.* 43:24–44:1.

[111] *Id.* 39:23–40:8.

[112] Arg. Tr. 14:2–10.

[113] *See* Pet'r Opening Br., Ex. B.

[114] *Id.*

[115] *Id.*

Accordingly, the Petitioner's exceptions are denied.

IT IS SO ORDERED.

Sincerely,

*/s/ Kathaleen St. Jude McCormick*

Kathaleen St. Jude McCormick
Chancellor